UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ALA ABDULLA, LANCE A. RAPHAEL, SAM MANGANO, KIRK PEDELTY, and RYAN GLAZE, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE, INC., <br><br> Defendant. | CIVIL ACTION <br><br> Case no. 17-cv-9178 <br><br><br> JURY TRIAL DEMANDED |

**CLASS ACTION COMPLAINT**

NOW COME the named Plaintiffs, by and through one of their attorneys, James C. Vlahakis of Sulaiman Law Group, Ltd., and bring this civil action as Class Action Complaint on behalf of themselves, and various classes of similarly situated individuals, pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a), 23(b)(2) and 23(b)(3) against Defendant APPLE, INC.:

**Jurisdiction, Parties and Venue**

1. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d)(2) because the amount in controversy exceeds $5,000,000, in the aggregate (exclusive of interest and costs) and least one member of the class is a citizen of a different state than Defendant Apple, Inc.

2. The amount in controversy easily exceeds $5,000,000, because tens of thousands of similarly situated putative class members into purchasing newer model iPhones based upon Defendant Apple, Inc.'s ("Apple") fraudulent scheme.

3. Plaintiff Ala W. Abdulla is a resident of the State of Illinois.

4. Plaintiff Lance Raphael is a resident of the State of Illinois.

5. Plaintiff Sam Mangano is a resident of the State of Ohio.

6. Plaintiff Ryan Glaze is a resident of the State of Indiana.

7. Plaintiff Kirk Pedelty is a resident of the State of North Carolina.

8. Apple is a California corporation with a principal place of business in Cupertino, California.

9. Venue is proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this District.

10. Venue is also proper in this district because Apple authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District, does substantial business in this District, and is subject to personal jurisdiction in this District.

**General Facts Supporting the Causes of Action**

11. As discussed below, Apple purposefully and knowingly released operating system software updates to iPhone 5, iPhone 6 and certain iPhone 7 phones that slowed the performance speeds of the central processing units ("CPUs") of these devices.

12. Apple's software updates purposefully slowed or "throttled down" the performance speeds iPhone 5, iPhone 6, certain iPhone 7 phones and as yet unknown versions of iPhones because operating system software updates (at times "iOS updates") wreaked havoc on batteries within these model devices.

13. Apple's iOS updates were engineered to purposefully slowdown or "throttle down" the performance speeds of the above devices which cause users of these devices to experience significant slowdowns in device performance.

14. Apple's iOS updates purposefully neglected to explain that the slowdowns in older model device performance and resulting lost or diminished operating performance could be remedied by replacing the batteries of these devices.

15. Apple's iOS updates purposefully neglected to explain that its purposeful throttling down of older model devices and resulting lost or diminished operating performance could be remedied by replacing the batteries of these devices.

16. Instead, Apple's decision to purposefully slowdown or throttle down these devices was undertaken to fraudulently induce consumers to purchase the latest iPhone versions of the iPhone 7, as well as new phones such as the iPhone 8 and iPhone X.

### Allegations Specific to Each Plaintiff

17. Prior to purchasing an iPhone X, Plaintiff Abdulla owned and utilized an iPhone 6.

18. Over time, Abdulla noticed appreciable slowdowns in the operation of her iPhone 6 after certain iOS updates were issued to her device.

19. Frustrated by the performance speed of her iPhone 6, Abdulla purchased an iPhone 7 Plus.

20. If Apple had publically explained that it was purposefully throttling down the performance speed of iPhone 6 devices, and that performance speed of iPhone 6 devices could be improved by a replacement battery, Abdulla would not have purchased an iPhone X to replace her iPhone 6.

21. Prior to purchasing an iPhone 7 Plus, Plaintiff Raphael owned and utilized an iPhone 6.

22. Over time, Raphael noticed appreciable slowdowns in the operation of his iPhone 6 after certain iOS updates were issued to his device.

23. Frustrated by the performance speed of his iPhone 6, Raphael purchased an iPhone 7 Plus.

24. If Apple had publically explained that it was purposefully throttling down the performance speed of iPhone 6 devices, and that performance speed of iPhone 6

devices could be improved by a replacement battery, Raphael would not have purchased an iPhone 7 plus to replace his iPhone 6.

25. Prior to purchasing an iPhone 7 Plus, Plaintiff Glaze owned and utilized an iPhone 6 Plus.

26. Over time, Glaze noticed appreciable slowdowns in the operation of his iPhone 6 Plus after certain iOS updates were issued to his device.

27. Frustrated by the performance speed of his iPhone 6 Plus, Glaze purchased an iPhone 7 Plus.

28. If Apple had publically explained that it was purposefully throttling down the performance speed of iPhone 6 devices, and that performance speed of iPhone 6 devices could be improved by a replacement battery, Glaze would not have purchased an iPhone X to replace his iPhone 6 Plus.

29. Prior to purchasing an iPhone 8, Plaintiff Pedelty owned and utilized an iPhone 7.

30. Over time, Pedelty noticed appreciable slowdowns in the operation of this iPhone 7 after certain iOS updates were issued to his device.

31. Frustrated by these slowdowns, Pedelty repeatedly contacted Apple customer support to help fix the performance of his phone.

32. Nobody from Apple customer support suggested that he replace his battery to improve the performance of his iPhone.

33. Instead, Apple issued Pedelty a replacement iPhone 7.

34. This replacement device suffered from significant slowdowns after certain iOS downloads.

35. Frustrated by slowdowns and intermittent shutdowns of his iPhone 7, Pedelty purchased an iPhone 8.

36. If Apple had publically explained that it was purposefully throttling down the performance speed of iPhone 7 devices, and that performance speed of iPhone 7 devices could be improved by a replacement battery, Pedelty would not have purchased an iPhone 8 to replace his iPhone 7.

37. Prior to purchasing an iPhone 7 for himself, Plaintiff Mangano owned and utilized an iPhone 6.

38. Prior to purchasing an iPhone 7 for his two minor children, Plaintiff Mangano owned and his minor children each utilized an iPhone 5c device.

39. Over time, Mangano and his minor children noticed appreciable slowdowns in the operation of their devices after certain iOS updates were issued to their devices.

40. Frustrated by the slower operating speeds of their devices, Mangano purchased three iPhones 7 (one for himself and one for each minor).

41. If Apple had publically explained that it was purposefully throttling down the performance speed of iPhone older devices, and that performance speed of iPhone 6 and 5c devices could be improved by a replacement battery, Mangano would not have purchased the above mentioned iPhone 7s.

**Additional Allegations as to Apple's Misconduct and Fraudulent Concealment**

42. On information and belief, owners of iPhone 5, iPhone 6 and early model iPhone noticed similar slowdowns in operating performance and operating speeds.

43. During each iOS update issued by Apple, Apple purposefully determined that it would not explain to Plaintiffs and other similarly situated consumers (with older iPhones) why (a) appreciable device slowdowns were taking place after various iOS updates, (b) that Apple was purposefully slowing/throttling down operating speeds of

older devices and (c) that device performance could be improved with replacement batteries.

44. Apple purposefully declined to make these disclosures because it knew that consumers would, more likely than not, purchase a new device out of (a) loyalty to Apple and/or (b) because Apple knew that its consumers desired to have devices performing at optimal speed that they had previously be used to.

45. Although Apple could have sent an alert to consumers informing consumers that the speed and performance older iPhones could be improved by installing new batteries, Apple declined to issue such an alert.

46. On December 20, 2017, Apple finally explained that it was purposefully slowing down the operating speed of older iPhone devices to conserve battery life.

47. According to Apple:

> **Our goal is to deliver the best experience for customers, which includes overall performance and prolonging the life of their devices. Lithium-ion batteries become less capable of supplying peak current demands when in cold conditions, have a low battery charge or as they age over time, which can result in the device unexpectedly shutting down to protect its electronic components.**
>
> **Last year we released a feature for iPhone 6, iPhone 6s and iPhone SE to smooth out the instantaneous peaks only when needed to prevent the device from unexpectedly shutting down during these conditions. We've now extended that feature to iPhone 7 with iOS 11.2, and plan to add support for other products in the future.**

48. Prior to this statement, Apple knowingly and purposefully decided that it would not inform consumers that the performance speeds of iPhone 5s, 6s and 7s would improve if consumers replaced their device's battery.

49. As a result of Apple purposefully failing to explain to consumers that a replacement battery will improve operating performance of older iPhones, Plaintiffs and

thousands of other consumers became frustrated with the performance of their devices and purchased new devices.

50. As alleged above, Apple's purposeful slowdown of the performance times of the iPhones used by the named Plaintiffs greatly reduced the effectiveness and usefulness of the subject telephones.

51. Apple's decision to not inform consumers that they could improve the performance speed of their devices by replacing their device's batteries reduced the effectiveness and usefulness of the subject telephones.

52. As a result of Apple's conduct, the named Plaintiffs incurred unnecessary expenses through the purchase of the new iPhones.

53. Additionally, Plaintiff Pedelty was unable to accept or make business related calls with his iPhone was inoperable as a result of its diminished performance and random shutdowns.

54. Prior to the purchase of their newer model iPhones, the named Plaintiffs tried, without success, to contact live Apple technical/customer service support staff and/or search Apple's website to discovery how to remedy and improve the operating speed of their iPhone devices.

55. Prior to the purchase of their newer model iPhones, none of the named Plaintiff learned or where told by Apple's website or live technical/customer service support staff that they could have improved the performance of their iPhone devices by replacing the batteries of their devices.

56. Prior to the purchase of their newer model iPhones, Apple's website and its technical/customer service support staff did not inform Plaintiffs that they could have improved the performance of their iPhone devices by replacing the batteries of their devices.

7

57. Prior to the purchase of their newer model iPhones, no Apple update disclosed to Plaintiff that they could have improved device performance by replacing the batteries of their devices.

58. Apple knew that battery replacements would have improved the performance of the types of older devices owned by Plaintiffs.

59. Had Plaintiffs been informed by Apple or its technical/customer service support staff that a battery replacement would have improved the performance of the above devices, they would have opted to replace the batteries instead of purchasing new phones.

60. Replacing batteries in the above devices would have been cheaper than purchasing new devices.

61. Apple purposefully concealed, fraudulently omitted and/or failed to disclose the fact that a battery replacement would improve the performance of older iPhones to require consumers to purchase newer device models.

62. Informing consumers that a batter replacement would improve iPhone performance was an important piece of information to a reasonable consumer who wanted to improve the performance of his or her older model iPhone.

63. Informing consumers that a battery replacement would improve iPhone performance was an important piece of information to a reasonable consumer who wanted to improve the performance of his or her older model iPhone in the most cost effective manner.

64. Withholding this information caused Plaintiffs and consumers to spend more money through the purchase of brand new iPhones.

65. Apple's failure to inform consumers that performance slowdowns on older iPhones was a result of Apple purposefully slowing down operating speed of iPhones constitutes a purposeful withholding of material information.

66. Apple's failure to inform consumers that performance slowdowns on older iPhones could be improved by the replacement of a battery constitutes a purposeful withholding of material information.

67. Additionally, Apple provided consumers with substandard chargers that resulted in diminished battery life, which worsened the effectiveness of older model iPhones.

68. Apple failed to inform consumers that the use of substandard chargers would result in diminished battery life, which worsened the effectiveness of older model iPhones.

## Count I – Illinois Consumer Fraud and Deceptive Business Practices Act

69. Plaintiffs restate and reallege the above paragraphs as through fully set forth herein.

70. The Illinois Consumer Fraud and Deceptive Business Practices Act ("IFCFA") states:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

71. Plaintiffs Abdulla and Raphael are each a "person" and a "consumer" as defined in ICFA, 815 ILCS 505/ (c) and (e) respectively

72. Apple was and is engaged in commerce in the State of Illinois with regard to Plaintiffs Abdulla and Raphael.

73. Apple's above conduct in failing to inform Plaintiff Raphael and others that (a) it was purposefully throttling back the performance speeds of older model iPhones and/or that (b) a battery replacement would improve iPhone performance to violated 815 ILCS 505/2 because its conduct constituted an unfair or deceptive act and/or practice under 815 ILCS 505/2.

74. Apple's above conduct violated 815 ILCS 505/2 because its above conduct constituted the use or employment of deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of a series of material facts.

75. Apple's above conduct is against public policy because it needlessly subjects consumers to purchasing newer and more expensive iPhones when a replacement battery could have allowed consumers to continue to use their older iPhones.

76. Thousands of Illinois consumers have been harmed by Apple's above conduct.

77. An award of punitive damages is appropriate because Apple's conduct described above was outrageous, willful and wanton, showed a reckless disregard for the rights of Plaintiffs and other consumers.

78. The proposed class can be defined to include: all Illinois Residents (a) who replaced iPhone 5c, iPhone 5s, iPhone 6s and early model iPhone 7s (b) because the

slow performance of their phones led them to believe (c) that they had to purchase to a new model iPhone 7, iPhone 8 or iPhone X and (d) these persons were not told by Apple that a battery replacement would improve performance time and (d) these persons were not told by Apple that a battery replacement would improve performance time.

WHEREFORE, Plaintiffs Abdulla and Raphael request that this Honorable Court:

a. Enter judgment in favor of Plaintiffs Abdulla and Raphael, the proposed class and against Apple;
b. Award damages in an amount to be determined at trial;
c. Award punitive damages in an amount to be determined at trial; and
d. Award Plaintiffs reasonable attorney's fees and costs pursuant to 815 ILCS 505/10a(c).

## Count II – Indiana's Deceptive Consumer Sales Act

79. Plaintiffs restate and reallege the above paragraphs as through fully set forth herein.

80. The purpose of the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*, is to "protect consumers from suppliers who commit deceptive and unconscionable sales acts" and to "encourage the development of fair consumer sales practices." I.C. 24-5-0.5-1(b).

81. Section 3 of the DCSA sets out particular conduct that constitutes "deceptive acts" under the statute. I.C. 24-5-0.5-3(a) generally states that a "supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."

82. A "supplier" is defined as a "seller … or other person who regularly engages in or solicits consumer transactions, including soliciting a consumer transaction by

using a telephone facsimile machine to transmit an unsolicited advertisement ... ." I.C. 24-5-0.5-3(a)(3). A supplier "includes a manufacturer, wholesaler, or retailer, whether or not the person deals directly with the consumer." I.C. 24-5-0.5-2(a)(3).

83. Apple is a supplier, manufacturer and retailer under the DCSA.

84. The DCSA defines a "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, . . . to a person for purposes that are primarily personal . . . ." I.C. 24-5-0.5-2(a)(1).

85. I.C. 24-5-0.5-3(a) prohibits deceptive acts in connection with consumer transactions.

86. Apple's above described conduct violates I.C. 24-5-0.5-3(a).

87. Apple's conduct is an "incurable deceptive act" because the above described misconduct and deceptive act were undertaken by Apple "as part of a scheme, artifice, or device within intent to defraud or mislead . . ." consumers. I.C. 24-5-0.5-2(a)(8).

88. Thousands of Indiana consumers have been harmed by Apple's conduct.

89. The proposed class can be defined to include: all Indiana residents (a) who replaced iPhone 5s, iPhone 6s and early model iPhone 7s (b) because the slow performance of their phones led them to believe (c) that they had to purchase to a new model iPhone 7, iPhone 8 or iPhone X and (d) these persons were not told by Apple that a battery replacement would improve performance time.

WHEREFORE, Plaintiff Glaze requests that this Honorable Court:

    a. Enter judgment in favor of Plaintiff Glaze and proposed class and against Apple;
    b. Award damages in an amount to be determined at trial;
    c. Award treble damages in an amount to be determined;
    d. Award punitive damages in an amount to be determined; and

e. Award attorney's fees and costs pursuant to I.C. 24-5-0.5-4(a).

## Count III – North Carolina Unfair and Deceptive Trade Practices Act

90. Plaintiffs restate and reallege the above paragraphs as through fully set forth herein.

91. The purpose of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.* ("NCUDTPA") is provide a private right of action for aggreieved consumers.

92. The elements of a claim under the NCUDTPA require: (a) an unfair or deceptive act or practice; (b) in or affecting commerce; which (c) proximately caused actual injury to the claimant or his business.

93. An act or practice is deceptive under the meaning of §75-1.1 if it has the capacity or tendency to deceive.

94. An act or practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to customers

95. Apple's above described conduct was deceptive, immoral, unethical, oppressive, unscrupulous and/or substantially injurious to customers

96. Thousands of North Carolina consumers have been harmed by Apple's above conduct.

97. The proposed class can be defined to include: all North Carolina residents (a) who replaced iPhone 5s, iPhone 6s and early model iPhone 7s (b) because the slow performance of their phones led them to believe (c) that they had to purchase to a new model iPhone 7, iPhone 8 or iPhone X and (d) these persons were not told by Apple that a battery replacement would improve performance time.

WHEREFORE, Plaintiff Pedelty requests that this Honorable Court:

  f. Enter judgment in favor of Pedelty and the proposed class and against Apple;

  g. Award damages in an amount to be determined at trial;

  h. Award treble damages in an amount to be determined;

  i. Award punitive damages in an amount to be determined; and

  j. Award attorney's fees and costs based upon Apple's willful conduct.

### Count IV – Common Law Fraud – Nationwide Class

98. Plaintiffs restate and reallege the above paragraphs as through fully set forth herein.

99. The above allegations set forth a common law cause of action for fraud, and in particular, fraudulent concealment.

100. Tens of thousands of consumers nationwide have been harmed by Apple's conduct.

101. The proposed class can be defined to include: a nationwide class of persons (a) who replaced iPhone 5s, iPhone 6s and early model iPhone 7s (b) because the slow performance of their phones led them to believe (c) that they had to purchase to a new model iPhone 7, iPhone 8 or iPhone X and (d) these persons were not told by Apple that a battery replacement would improve performance time.

  WHEREFORE, Plaintiffs request that this Honorable Court:

  a. Enter judgment in the proposed class and against Apple;

  b. Award damages in an amount to be determined at trial; and

  c. Award punitive damages in an amount to be determined at trial.

**Count V – Unfair and Deceptive Business Practices – Nationwide Class**

102. Plaintiffs restate and reallege the above paragraphs as through fully set forth herein.

103. Plaintiffs bring this Count on behalf of all similarly situated residents of each of the 50 States and the District of Columbia, for violations of the respective statutory consumer protection laws, as follows:

   a. the Alabama Deceptive Trade Practices Act, Ala.Code 1975, § 8–19–1, *et seq.*;
   b. the Alaska Unfair Trade Practices and Consumer Protection Act, AS § 45.50.471, *et seq.*;
   c. the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq.*;
   d. the Arkansas Deceptive Trade Practices Act, Ark.Code §§ 4-88-101, *et seq.*;
   e. the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;
   f. the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;
   g. the Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq.*;
   h. the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;
   i. the Florida Deceptive and Unfair Trade Practices Act, FSA § 501.201, *et seq.*;
   j. the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;
   k. the Hawaii Unfair Competition Law, H.R.S. § 480-1, *et seq.*;
   l. the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;
   m. the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq.*;
   n. the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;
   o. the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;
   p. the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;
   q. the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq.*;
   r. the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq.*;
   s. the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

t. the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

u. the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*;

v. the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

w. the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

x. the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq.*;

y. the Nebraska Consumer Protection Act, Neb.Rev.St. §§ 59-1601, *et seq.*;

z. the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*;

aa. the New Hampshire Regulation of Business Practices for Consumer Protection, N.H.Rev.Stat. § 358-A:1, *et seq.*;

bb. the New Jersey Consumer Fraud Act, N.J.S.A. 56:8, *et seq.*;

cc. the New Mexico Unfair Practices Act, N.M.S.A. §§ 57-12-1, *et seq.*;

dd. the New York Consumer Protection from Deceptive Acts and Practices, N.Y. GBL (McKinney) § 349, *et seq.*;

ee. the North Dakota Consumer Fraud Act, N.D. Cent.Code Chapter 51-15, *et seq.*;

ff. the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.*;

gg. the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

hh. the Oregon Unlawful Trade Practices Act, ORS 646.605, *et seq.*;

ii. the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

jj. the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

kk. the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq.*;

ll. the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq.*;

mm. the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

nn. the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

oo. the Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq.*;

pp. the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

qq. the Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq.*;

rr. the Washington Consumer Protection Act, RCWA 19.86.010, *et seq.*;

ss. the West Virginia Consumer Credit And Protection Act, W.Va.Code § 46A-1-101, *et seq.*;

tt. the Wisconsin Deceptive Trade Practices Act, WIS.STAT. § 100.18, *et seq.*; and

uu. the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq.*

104. As set forth above, thousands of consumers bought newer model iPhones because of Apple's misconduct, deceptive practices and omissions.

105. Accordingly, Apple's conduct violated the above statutory consumer protection laws.

106. An award of punitive damages is appropriate (where allowed under state law) because Apple's conduct described above was outrageous, willful and wanton, showed a reckless disregard for the rights of Plaintiffs and other consumers.

107. The proposed class can be defined to include: Residents from above identified states and the District of Columbia who (a) who replaced iPhone 5s, iPhone 6s and early model iPhone 7s (b) because the slow performance of their phones led them to believe (c) that they had to purchase to a new model iPhone 7, iPhone 8 or iPhone X and (d) these persons were not told by Apple that a battery replacement would improve performance time.

WHEREFORE, Plaintiff requests that this Honorable Court:

a. Enter judgment in the proposed class(es) and against Apple;

b. Award damages in an amount to be determined at trial;

c. Award punitive damages in an amount to be determined at trial; and

d. Award Plaintiff his reasonable attorney's fees and costs pursuant any applicable state statute.

**The Elements of FRCP 23 Can Be Met**

108. Numerosity is satisfied because thousands of consumers bought newer model iPhones as a result of Apple's misconduct, deceptive practices and omissions.

109. The joinder of all members of the Class is impracticable.

110. Commonality and predominance are satisfied because Apple acted in a common manner toward Plaintiff and the proposed class members

111. As set forth above, there are questions of law and fact common to Plaintiffs and the proposed class members such and these common questions predominate over any potential individual issues.

112. Plaintiffs' claims are typical of the claims of the proposed class members, claims all arise from the same operative facts and are based on the same legal causes of action.

113. As set forth above, common questions of proof predominate over any potential individual issues.

114. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interest antagonistic to those of the Class and Defendants do not have any defenses unique to Plaintiffs.

115. Plaintiffs' lead attorney (James C. Vlahakis) is an experienced consumer class action litigator who has defended over a hundred consumer-based claims.

116. In conjunction with counsel for the class members, Mr. Vlahakis obtained Court approval has obtained approval of various TCPA class actions. *See, e.g., In Re Capital One Telephone Consumer Protection Act Litigation,* 2012-cv-10064 (N.D. Ill.) ($75 million dollar ATDS based settlement); *Prater v. Medicredit, Inc.,* 2014-cv-0159 ($6.3 million dollar ATDS wrong party settlement); *INSPE Associates v. CSL Biotherapries, Inc.* (N.D. Ill.) ($3.5 million fax based settlement).

117. Based upon nearly twenty years of experience, Mr. Vlahakis understands the defense typically utilized by creditors and debt collectors in TCPA litigation. For example, Mr. Vlahakis has successfully defeated a TCPA based class certification motion in *Jamison v. First Credit Services, Inc.*, 290 F.R.D. 92 (N.D. Ill. Mar. 28, 2013), reconsideration denied, 2013 U.S. Dist. LEXIS 105352 (N.D. Ill. July 29, 2013). As an additional example, Mr. Vlahakis also decertified a previously certified TCPA class action in *Pesce v. First Credit Services, Inc.*, 2012 U.S. Dist. LEXIS 188745 (N.D. Ill. June 6, 2012).

118. Additionally, Mr. Vlahakis (as a former consumer class action defense attorney) has gained court approval of dozens of class action settlements. As a former consumer class action defense attorney, Mr. Vlahakis has a vast level of knowledge that will assist him in advocating *for* Plaintiffs and the putative class members. Additionally, Mr. Vlahakis has successfully ascertained the identities of putative class members individually and in conjunction with industry experts.

119. Plaintiffs' other counsel are highly competent and experienced class action attorneys.

120. In summary, a class action is an appropriate method for the fair and efficient adjudication of this controversy, and superior to other available methods for the fair and efficient adjudication of this controversy. Simply stated, the common questions of law and fact enumerated above predominate over questions affecting only individual Class members. The likelihood that individual Class members will prosecute separate actions is remote due to the extensive time and considerable expense necessary to conduct such litigation, as well as the absence of a fee shifting mechanism.

**Plaintiffs demand trial by a jury.**

Dated: December 21, 2017

Respectfully Submitted,

/s/ James Vlahakis
James Vlahakis
*Lead Counsel for Plaintiff*
Sulaiman Law Group, Ltd.
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
(630)581-5456
jvlahakis@sulaimanlaw.com

*Additional Counsel*
Omar Sulaiman
Mohammed Badwan
Ahmad Sulaiman
Nathan C. Volheim
Sulaiman Law Group, Ltd.
2500 South Highland Avenue,
Suite 2500 Lombard, IL 60148